

1                   UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA - CENTRAL DIVISION

3             HONORABLE GEORGE H. WU, U.S. DISTRICT JUDGE

4

5   UNITED STATES OF AMERICA,

6                       Plaintiff,

7           vs.                          Case No. CR 21-338

8   ROBERT QUIDO STELLA,

9                       Defendants.
                                     /
10  _____

11                       ** SEALED **

12

13                  REPORTER'S TRANSCRIPT OF
                       SENTENCING HEARING
14              Thursday, February 8, 2024
                       10:00 a.m.
15              LOS ANGELES, CALIFORNIA

16

17

18

19

20  _____

21
            TERRI A. HOURIGAN, CSR NO. 3838, CCRR
22            FEDERAL OFFICIAL COURT REPORTER
            350 WEST FIRST STREET, ROOM 4311
23            LOS ANGELES, CALIFORNIA  90012
                     (213) 894-2849
24

25

                   UNITED STATES DISTRICT COURT

1                          **APPEARANCES OF COUNSEL:**

2

3  **FOR THE PLAINTIFF:**

4       UNITED STATES ATTORNEY'S OFFICE
        United States Attorney
5       BY:  LYNDSI SAMILLE ALLSOP
             CATHERINE RICHMOND
6            Assistant United States Attorneys
        United States Courthouse
7       312 North Spring Street
        Los Angeles, California  90012
8

9

    **FOR THE DEFENDANT:**
10
        FEDERAL PUBLIC DEFENDER'S OFFICE
11      BY:  GABRIELA RIVERA
             ADITHYA MANI
12           Deputy Federal Public Defenders
        Central District of California
13      321 East Second Street
        Los Angeles, California 90012
14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1          **LOS ANGELES, CALIFORNIA; THURSDAY, FEBRUARY 8, 2024**

2                              **10:00 a.m.**

3                              --oOo--

4

5          THE COURT:  Let me call the matter of *United States*

6   *versus Stella*.  Let me have appearances starting with

7   government counsel first.

8          MS. ALLSOP:  Good morning, Your Honor.  United

9   States Attorney, Lyndsi Allsop appearing on behalf of the

10  government.

11      With me at counsel table is HSI Special Agent Victoria

12  Scott, and Assistant United States Attorney Catharine Richmond.

13         THE COURT:  For the defense?

14         MS. RIVERA:  Good morning, Your Honor.  Gabriela

15  Rivera and Adithya Mani on behalf of Mr. Robert Stella, who is

16  present and in custody.

17         THE COURT:  All right.  Is there a request to seal

18  the courtroom?

19         MS. RIVERA:  We're requesting the courtroom be

20  sealed from the public with the exception of family and friends

21  of Mr. Stella, or, I guess, family or friends of the victims

22  who are present today.

23         THE COURT:  Okay.

24         MS. ALLSOP:  Your Honor, the government would be

25  opposing that request.  This wasn't a trial where the courtroom

1    was sealed.

2           This isn't, for example, a national security case where

3    there are state secrets that the public should not have access

4    to.

5           THE COURT:  Well, the thing about it is, they are

6    going to be referencing victims, underage persons, et cetera,

7    et cetera, so I will seal the courtroom for that.

8           However, I will allow persons who are associated, either

9    with the defendant or with the victims to remain, because they

10   are going to speak as well, so I will do that, but otherwise, I

11   will seal the courtroom.

12                          (Courtroom was sealed.)

13          All right.  We're here for sentencing.

14          Let me summarize the situation, then I will allow both

15   counsel and defendant to speak.

16          There was a couple of items that kind of, like, really

17   are sort of nuanced, so if I do get something wrong, feel free

18   to correct me on this.

19          Also, there were revised pre-sentence reports and things

20   of that sort as well.

21          The defendant pled guilty to Counts 1 through 3 of the

22   six-count indictment.

23          Counts 1 through 3 alleges a violation of 18, U.S.C.,

24   Section 2251(a), which is production of child pornography.

25          The defendant was found guilty at a trial of Counts 4

1  through 6, which charged possession of child pornography where

2  the minors were below 12 years of age, some of the minors that

3  were involved were 12 years of age.  That is in violation of

4  18, U.S.C., Section 2252A(a)(5)(B).

5          MS. ALLSOP:  Your Honor, I apologize.  The defendant

6  pleaded guilty to Counts 4 through 6, which was the possession

7  and access with intent to view child pornography.

8          He put the government to its burden of proof on the

9  production counts, Counts 1 through 3.

10          THE COURT:  I thought -- I got that wrong then.  Let

11  me make sure, I should have known that, because I was the Judge

12  who tried this matter.

13          Let me take another look, you are right, Counts 4

14  through 6, he plead to and Counts 1 through 3 are ones that

15  were tried.

16          All right.  As to the offense level, the Probation

17  Office sets the offense level base as to Count 1 at 32 under

18  2G2.1(a), and then there was a two-level increase because of

19  the victim was approximately 12 years old at the time, under

20  Section 2G2.1(b), and then additional two levels because the

21  defendant was the relative of the victim under

22  Section 2G2.1(b)(5), and then a two-level increase because of

23  the use of computer under Section 2G2.1(b)(6)(B) for a total

24  offense level of 38.

25          As to Count 2, the base was set at 32, plus two, for the

1    victim being 13 years old at the time, and plus two, because

2    the defendant had supervision over the victim, plus an

3    additional two levels, because of the use of computer for a

4    total again of 38.

5            As to Count 3, the base offense was 32, because the

6    victim was younger than 12.  There was a four-level increase,

7    plus two for supervising control or supervisory control, plus

8    two for use of the computer for a total offense level of 40.

9            Counts 4 through 6, the base was set at 18 under Section

10   2G2.2(a)(1).  There was a two-level increase because of certain

11   images of the children were as young as five years of age, and

12   that is under Section 2G2.2(b)(2).

13           And the other -- there were other images with depictions

14   of penetration and also other images that might considered to

15   be even masochistic or the sexual abuse of a prepubescent

16   child.

17           There was an additional four levels under

18   Section 2G2.2(b)(4), and that is -- then there was an

19   additional five levels because there were more than 600 images

20   involved for a total offense level of 29, that was as to all

21   Counts 4 through 6.

22           In terms of the defendant's criminal history, he has

23   none, therefore, he falls within Category 1.

24           In terms of the defendant's background, he's

25   approximately 50 years old.  His parents are alive and still

1    working.  He has one sister.

2         The defendant reports having a normal childhood.  He

3    graduated from high school and went to American Military

4    University, and obtained a bachelor's degree in criminal

5    justice in 2011, obtained a master's degree in performance

6    psychology from National University.

7         In 2017, he was working on a Ph.D. at the time of his

8    arrest in 2021.

9         Between 1993 and 2017, he was a Navy seal and obtained

10   honorable discharge, and at one point, also received a bronze

11   star for valor.

12        Between 2017, and time of his arrest, he was working at

13   a performance consulting group.

14        He married in 1998, has three children ages 24, 22, and

15   18.  The two oldest are male children, and the 18-year-old is a

16   female and Victim No. 1.

17        The defendant does not report any history of substance

18   abuse.

19        He reports receiving severe traumatic brain injuries

20   during his military service and indicates receiving treatment

21   for post-traumatic stress disorder starting approximately in

22   2012, due to his military experiences.

23        The Probation Office's recommendation is at an offense

24   Level 43, Criminal History Category I, equals -- well, equals a

25   lifetime sentence in prison.

1       The Probation Office recommends 30 years as to Counts 1

2   through 3, and 20 years as to Counts 4 through 6, all to run

3   consecutively with each other, which totals 150 years, and a

4   lifetime of supervised release.

5       The government's position is that, while it was not

6   revealed at trial, the government asserts that the defendant on

7   one occasion entered the --

8           MS. ALLSOP:  Your Honor, may we have a brief

9   sidebar, please?

10          THE COURT:  Sure.

11          MS. ALLSOP:  Thank you.

12          THE COURT:  The sidebar is that direction.  This is

13  not my normal courtroom.

14                  (Sidebar begins.)

15          THE COURT:  Yes.

16          MS. ALLSOP:  Thank you, Your Honor.  This morning,

17  minor Victim 1 contacted the government and asked that the

18  hands-on contact offense not be discussed in open court, and so

19  the government is going to honor her request and not explicitly

20  refer to that incident.

21      It seems like Your Honor was about to refer to it.

22          THE COURT:  I was about to refer to it because it's

23  in the presentence report and it's also talked about

24  extensively in the government's filing.

25      If you are saying I should not consider it, I won't

1    consider it, but the problem is, is that it is a large portion.

2            MS. ALLSOP:  We would like for it to be considered

3    but we also want to honor her wishes not to be discussed in

4    open court.

5            So the government might just say conduct referred to in

6    its under sealed papers.

7            THE COURT:  What is the defense's position?

8            MS. RIVERA:  We understand and respect that, and

9    that's fine with us, Your Honor.

10           THE COURT:  I won't refer to it then.

11           I will just refer to -- let me indicate, I will refer to

12   it, the presentence report is under seal anyway, so I will

13   refer to it, I think it's commented on -- I will find it -- the

14   paragraph it's commented on, I would just say I think it's

15   Paragraph 90 in the revised -- it's at Docket No. 240, so it's

16   Paragraph 90, that is right?

17           MS. ALLSOP:  Yes, Your Honor.

18           THE COURT:  Everybody agrees to that?

19           I will refer to it as it is commented on Paragraph 90.

20           Let me ask one other question, I'm going to ask this

21   later anyway, the Probation Office indicates that it refers to

22   as "offense behavior not part of relevant conduct."

23           What does that mean?

24           I mean, the Probation Office refers to it, but then says

25   "offense behavior not part of relevant conduct."

1        I don't quite understand what that means.

2            MS. ALLSOP:  I can't speak to what the probation

3    officer meant; however, the government would consider the

4    conduct in Paragraph 90 to be relevant conduct under 1B1.1(3).

5            MS. RIVERA:  I think it's not clear, Your Honor,

6    that it is relevant conduct or part of the offense conduct.

7        I think that is sort of reflected in the probation

8    officer's report.

9            THE COURT:  Well, let me ask this, if I don't refer

10   to it -- I will refer to her as Victim 1.  Victim 1 indicated

11   to my clerk she wants to speak this morning.

12       Am I not supposed to refer to it if I discuss it with

13   her?

14           MS. ALLSOP:  In her e-mail to the government this

15   morning, she says she does not want it to referred to at all in

16   open court.

17           THE COURT:  I presume that -- would there be an

18   objection if I exclude everyone from the courtroom, family

19   members, victims, everybody, just except for the counsel and

20   the defendant, and court staff, when I question her on it?

21   Would there be an objection to that?

22           MS. ALLSOP:  No objection from the government.

23           MS. RIVERA:  Sorry, no objection from the defense,

24   Your Honor.

25           THE COURT:  Okay.

```
 1              MS. ALLSOP:  Thank you.

 2              MS. RIVERA:  Thank you.

 3                       (Sidebar ends.)

 4         THE COURT:  All right.  I will just simply refer to

 5    the particular incident as the incident that is described in

 6    Paragraph 90.  I have taken a look at that.

 7         Insofar as -- well, let me actually have counsel on

 8    sidebar just to clarify one other thing.

 9                       (Sidebar begins.)

10         THE COURT:  I presume there is no problem because

11    what I was going to go into next is a short description of the

12    crimes themselves, and obviously, crimes -- Counts 1 through 3,

13    was involving placing a camera in his daughter's bedroom and

14    recording both his daughter and two of her childhood friends,

15    who were between the ages of 11 and 13 at that time.

16         I presume there is no problem with that?

17              MS. ALLSOP:  She specifically didn't want that

18    incident referred to.  The incident in Paragraph 90.

19         THE COURT:  Not the other ones.

20              MS. ALLSOP:  Yes.  But referring him placing the

21    recording equipment in her bedroom and in her bathroom, she did

22    not indicate she did want that spoken about, that is relevant

23    conduct.

24              MS. RICHMOND:  That is the offense conduct.

25              THE COURT:  That obviously was discussed during the
```

```
 1   trial, I just want to make sure I'm on the same page with

 2   everyone that I can refer to it.

 3            MS. RIVERA:  Your Honor, to make our position clear,

 4   of course, we understand Your Honor can refer to it.  That

 5   evidence did come out at trial.

 6        Mr. Stella, of course, was convicted for the images

 7   captured from the family bathroom, and I don't think that the

 8   images from the bedroom, while those might be considered

 9   relevant conduct, I don't think --

10            THE COURT:  He placed hidden cameras in the bedroom

11   and bathroom and recorded certain things.

12            MS. RIVERA:  Thank you, Your Honor.

13            MS. RICHMOND:  Thank you.

14                      (Sidebar ends.)

15            THE COURT:  All right.  The Court will refer to in

16   terms of description of the crimes involved, briefly, the

17   defendant's crimes in Counts 1 through 3 arose from the placing

18   of hidden cameras in his daughter's bedroom and bathroom, where

19   he recorded approximately 14 videos of his daughter and two of

20   her childhood friends, who were at the time, between ages 11

21   and 13, while they undressed, showered, and used the toilet.

22        Let me just ask, there is no evidence of distribution of

23   those images?

24            MS. ALLSOP:  There is not, Your Honor.

25            MS. RIVERA:  There is none, Your Honor.
```

1          THE COURT:  Thank you.

2          And then as to Counts 4 through 6, the defendant

3    possessed about 46 videos and additional stills from the videos

4    of certain videos obtained from the dark web, which depicted

5    children as young as about five-years-old engaged in sexual

6    activities, sometimes with adults and a few of which can be

7    characterized as involving either bestiality or masochistic

8    actions.

9          MS. ALLSOP:  Your Honor, I apologize, just one

10   question.

11         There were approximately 14 videos that were obtained

12   from the bathroom hidden camera, and then from those, that is

13   where the 100 -- approximately 100 screen shots were, because

14   defendant made screen shots of those videos.

15         Separately, there were the 46 images he possessed on his

16   hard drive and computer.

17         THE COURT:  I noted the difference.  I said as to

18   the videos, there were 14 videos.  There might have been some

19   stills from the videos as well, but they were all derived from

20   the original 14 videos, whereas the 46 I referred, those as

21   being from the dark web, and there was additional stills taken

22   from those as well.

23         Is the defense counsel standing for a particular reason?

24         MS. RIVERA:  No, Your Honor.  Thank you.

25         THE COURT:  All right.  Thank you.

1        Again, this is -- I'm describing now at this point in

2   time the government's sentencing position, which the government

3   talks about the crimes, which I have characterized.

4        The government also argues that the defendant never

5   fully accepted responsibility for his actions, and notes that

6   the defendant had characterized his activity as mainly an

7   interest in teen pornography, and only pled to Counts -- I

8   guess, four to six months before the scheduled trial.

9        The government also argues that the defendant engaged in

10  grooming other children by being involved in various children

11  activities within the community.

12       The government agrees that the Probation Office did the

13  correct calculation, which can potentially get up to 150 years'

14  sentence.

15       The government asks for a sentence of 65 years with a

16  special assessment of $50,000, and also argues for restitution

17  to the victims.  And the government has submitted a number of

18  exhibits, including a PSIO evaluation from the Bureau of

19  Prisons, and a written statement from -- a written statement

20  and a video from Victim 2 and Victim 3, and a father's

21  statement as to minor Victim 3.

22       The defense's brief, both the original and supplemental,

23  argues for a different -- slightly different calculation of the

24  guidelines numbers.

25       As to Counts 1 and 2, the defense argues that the

1    adjusted level should be 36 rather than 38, and that as to

2    Count 3, it should be 38 instead of 40.

3          Also, that the overall adjusted guidelines level should

4    be 41 instead of 43, and also the defense argues there should

5    have been a negative two levels for acceptance of

6    responsibility under 3E1.1, so therefore, it would end up being

7    39 at a Criminal History Category II, which equals guidelines

8    range between 262 to 327 months.

9          The defense asks for the mandatory minimum of

10   180 months.

11         The defense also argues that the average sentencing

12   range for an offense level of 39 at Criminal History Category

13   I, the average sentencing -- well, the average sentencing

14   figure would be 232 months, with the mean sentence at

15   240 months, which is much less obviously than the government's

16   65-year request.

17         The defense also raises PTSD as a factor in this case,

18   although, the government challenges whether or not the

19   defendant actually has that condition.

20         Defense also argues that the defendant is a devoted

21   family man, that he also notes the service to the country in

22   the form of military service, and the bronze metal, and the

23   defense has included letters from the defendant's wife, two

24   sons, and daughter, the defendant's father, mother, sister, and

25   mother-in-law and many, many friends and colleagues.

1          Let me ask --

2              MS. ALLSOP:  Yes, Your Honor.  I just wanted to

3     highlight some of the exhibits that the government also filed

4     were left off in your description, just because they included

5     minor victim statements.

6              For the record, I want to make it clear that the

7     government, in addition to filing a video and written statement

8     from minor Victim 2, also filed a written statement for minor

9     Victim 3, and written statement from minor Victim's 3 parents.

10             In addition, the government attached an interview from

11    the day of his arrest, and the initial law enforcement

12    interviews of minor Victims 1 through 3 after his arrest.

13             THE COURT:  Okay.  Other than that, let me ask, have

14    I summarized the situation correctly, starting with government

15    counsel first?

16             MS. ALLSOP:  Yes.

17             THE COURT:  Defense counsel, have I summarized it

18    correctly?

19             MS. RIVERA:  Yes, Your Honor.

20             THE COURT:  Other than what both sides have already

21    presented to me, is there anything else that either side wants

22    to submit in regards to the presentence report?

23             MS. ALLSOP:  Yes, Your Honor.

24             THE COURT:  What else?

25             MS. ALLSOP:  For appellate purposes, the government

```
 1  also just wanted to object on the record that the defense's
 2  objections to the PSR were over 100 days late and just submits
 3  they shouldn't be considered for that reason.
 4        Also, the government would just like to argue regarding
 5  the use of computer enhancement.
 6             THE COURT:  I will get to that.  I am just talking
 7  about errors in the pre- the Probation Office's presentence
 8  report itself.
 9        I'm going to allow, obviously, everybody to argue
10  everything, but I wanted to make sure that there is no problems
11  as to the contents of the pre - the Probation Office's
12  presentence report?
13             MS. ALLSOP:  No, Your Honor.
14             THE COURT:  As amended.  And for the defense?
15             MS. RIVERA:  No, Your Honor.
16             THE COURT:  Let me ask the defendant, sir, did you
17  have an opportunity to look at both the original and revised
18  presentence report from the Probation Office?
19             THE DEFENDANT:  Yes, Your Honor.
20             THE COURT:  Other than what your attorneys have
21  presented to me, is there anything that is contained in any of
22  those reports you think is incorrect or should be changed or
23  modified?
24             THE DEFENDANT:  No, Your Honor.
25             THE COURT:  All right.  I just have couple of
```

1    questions and then I will allow counsel to argue.

2         First of all, insofar as the government's request for

3    restitution -- sorry, for special assessment of $50,000, I will

4    not grant that, because I expect that the government will also

5    ask for restitution to the victims, and I will do that, but I

6    will not order anything above the original $600 special

7    assessment figure.

8         So the 50,000, I'm not going to award.

9         As to -- I asked a question as to Paragraph 90 on

10   sidebar and you have kind of answered already.

11        Let me ask, is there any evidence that the defendant was

12   involved in any of these activities other than for his own

13   personal consumption?

14        MS. ALLSOP:  Is Your Honor asking, if perhaps, he

15   was recording and distributing these images to other people?

16        THE COURT:  Or anything of that sort.  In other

17   words, the crimes themselves all basically for personal

18   consumption?

19        MS. ALLSOP:  The government is not aware of any

20   evidence that the defendant was uploading, you know, images or

21   transferring images between himself and other individuals, no.

22        THE COURT:  All right.  So I presume the defense

23   agrees with that?

24        MS. RIVERA:  Yes, Your Honor.  There is nothing that

25   has ever suggested that Mr. Stella ever attempted to distribute

```
 1    these images or share them in any way.
 2              THE COURT:  All right.  And let me also indicate
 3    that, you know, I will consider the defendant's, to the extent
 4    I can, his service -- military service as a factor to reduce
 5    the sentence.
 6         Let me ask, further arguments in regards to sentencing
 7    here?
 8         Who wants to go first?
 9         You have said a lot in your papers and you don't
10    necessarily have to say anything in addition if you don't want
11    to.
12              MS. ALLSOP:  I can go first, Your Honor.
13         As it relates to the use of computer enhancement, the
14    government would concur with the findings by the probation
15    officer in the PSR, and in addition, the government would just
16    submit that there is a cross section in 2G2.2 --
17              THE COURT:  What thing in 2G2.2?
18              MS. ALLSOP:  Cross Section 2G2.2(b)(6) in which
19    there is a computer enhancement for the use of a computer or
20    other interactive device relating to the possession,
21    distribution, receipt, transmission of child pornography.
22              THE COURT:  I think, although, frankly, that
23    particular aspect was put -- probably put in, in a time when it
24    was somewhat surprising that one would use a computer, the use
25    of sophistication of the computer, but frankly now, a computer
```

1    is everywhere and in everything, so, it doesn't seem like it's

2    all that special.

3              MS. ALLSOP:  Your Honor, respectfully --

4              THE COURT:  I do understand it's provided for, I'm

5    not saying that -- I know it's there.

6         I'm not -- let's put it this way, given the -- I

7    understand the evidence of both sides insofar as setting a

8    guidelines range, but frankly, I basically will say that I

9    probably will adopt the Probation Office's calculations,

10   because technically it's right, but for purposes of selecting

11   an appropriate sentence, I will go outside the guideline.

12             MS. ALLSOP:  We understand that, Your Honor.

13             THE COURT:  Even the government is recommending

14   going outside the guideline, because I mean, the 65 years is

15   outside the guideline.

16             MS. ALLSOP:  Your Honor, respectfully the government

17   does feel a 65-year sentence is appropriate.

18             THE COURT:  I'm going to allow you to argue whatever

19   you are going to argue, but everybody is going outside the

20   guideline at this point.

21             MS. ALLSOP:  That is variance, Your Honor.  However,

22   a 65-year sentence is still, as the government will later argue

23   and as it's submitted in its papers, it meets the enumerated

24   factors in 3553(a), but as I may continue, as it relates to the

25   computer enhancement.

1          THE COURT:  Sure.  I think what she is already

2    saying, it's technically correct, so you didn't want to argue

3    anything more about it.  Did I overhear you say something to

4    that effect?

5          MS. ALLSOP:  As it relates to the computer use, Your

6    Honor, as I was saying earlier, there is a cross section in

7    2G2.2(b)(6) in which the commission allowed for certain

8    enhancements where a computer is used to possess, transmit,

9    distribute, receive, child pornography.

10         Your Honor raised that perhaps this enhancement may be a

11   bit dated, however, the commission recently amended these

12   guidelines in November of 2023, and did not see fit to remove

13   this.

14         THE COURT:  I'm not saying that -- it says what it

15   says, I feel it's kind of, like, outdated, but I have indicated

16   I'm not changing the guidelines calculation that was done by

17   the Probation Office, it's technically correct.

18         MS. ALLSOP:  I will move on to acceptance of

19   responsibility, Your Honor.

20         THE COURT:  Okay.

21         MS. ALLSOP:  As it relates to acceptance of

22   responsibility, as the government outlined in its position

23   papers, the defendant does not deserve acceptance of

24   responsibility points.

25         This is for several reasons:  First, he did not satisfy

1    any of the criteria under Application Note 1(a) through (h).

2         He did not truthfully admit to the full extent of his

3    conduct to include the conduct in Paragraph 90 of the PSR or

4    second amended PSR, he did not pay restitution.

5              THE COURT:  He wasn't charged in any way as to that.

6              MS. ALLSOP:  But acceptance of responsibility, as I

7    will shortly say, Your Honor, if you then want to turn to

8    Application Note 3 includes taking full accountability for

9    relevant conduct under 1B1.3.  The conduct that occurred in

10   Paragraph 90 is absolutely, without a doubt, relevant.

11             THE COURT:  The Probation Office describes it as

12   offense behavior, not part of relevant conduct, which is a

13   question I asked at sidebar.

14             MS. ALLSOP:  The government would disagree with that

15   category.

16             THE COURT:  I understand you disagree, but at least

17   the Probation Office would agree with my position on it.

18             MS. ALLSOP:  Perhaps it was a typo, Your Honor.

19             THE COURT:  Which part?  My part, the Probation

20   Office's part, or your part?

21             MS. ALLSOP:  Not on the government's part, Your

22   Honor.

23             THE COURT:  The government never makes typos?

24             MS. ALLSOP:  We assume there was an error and that

25   she meant it's not offense conduct, but it is indeed relevant.

1          Moving back to my previous argument as it relates to

2    Application Note 1(a) through (h).

3          He did not pay restitution prior to the adjudication of

4    his guilt.  He did not voluntarily surrender to the

5    authorities.  He did not voluntary assist authorities in

6    recovering evidence of his crimes.

7          Also, the timeliness of his plea is very relevant.

8          He strategically pleaded guilty days prior to the

9    April 2023 trial date in a strategic move to suppress some of

10   the most horrific evidence in this case, which included

11   children as young as five years old being penetrated by adult

12   men.

13         In addition, both pre- and post-trial, the defendant has

14   not made any statements that the government is aware of in

15   unprivileged jail calls, expressing contrition and

16   acknowledging that he is in fact a pedophile.

17         With respect to Application Note 2, even if he did go to

18   trial just to preserve issues that didn't relate to factual

19   guilt, the application note specifically states that a

20   determination that a defendant has accepted responsibility will

21   be based primarily upon pretrial statements and conduct.

22         Here, his pretrial statements and conduct are incredibly

23   telling.  He repeatedly lied to law enforcement when asked if

24   he possessed child pornography, if he intentionally viewed

25   child pornography on the dark web, and this automatically

1  disqualifies him from being eligible to receive acceptance of

2  responsibility.

3         As it relates to Application Note 3, as I previously

4  stated, acceptance of responsibility also requires that the

5  defendant truthfully admit to all relevant conduct, and he has

6  not admitted to the relevant conduct as it relates to the

7  conduct in Paragraph 90.

8         And the application notes that this evidence would

9  outweigh any sort of factoring in of acceptance of

10  responsibility, even if a defendant were to plead to certain

11  counts.

12         Because he has refused to admit that he is a pedophile,

13  he's refused to accept the full extent of his conduct, he is

14  not entitled to acceptance of responsibility points.

15         If I may add, what makes his lack of acceptance of

16  responsibility particularly striking, he's not presently

17  undergoing any therapy at MDC LA to treat his pedophilia, nor

18  does it appear from any medical records from the prison that he

19  has undergone therapy to specifically address this issue.

20         Indeed, his last encounter with MDC LA therapist was in

21  June of 2023, which I might note was right after trial.  During

22  that interaction, he rejected the services from the

23  psychologist.

24         As it relates to the defendant's minimal criminal

25  history, which the defense is arguing necessitates a variance,

1    Your Honor, the commission just amended the guidelines in

2    November of 2023, and saw fit not to include offenders such as

3    the defendant.

4         In 4C1.1 there is a carve-out for zero point offenders

5    that explicitly excludes people like the defendant.

6         THE COURT:  I don't think the defense is going to

7    make that argument now.

8         MS. ALLSOP:  In addition, if I just may add briefly,

9    the defendant's criminal history is not of normal for an

10   individual who has been convicted of a production crime.

11        In 2019, 70.3 percent of child pornography production

12   offenders, who were in Criminal History Category I, by

13   contrast, with 44.2 percent of all other offenders.

14        Finally, as it relates to the PTSD argument that the

15   defendant is making, MDC LA psychologist found he did not

16   exhibit PTSD symptoms, and notably, the defense has not

17   provided a recent evaluation showing he has a PTSD diagnosis at

18   this moment, so therefore, the government submits that the

19   request for variance based on his purported PTSD diagnosis is

20   unsupported and inappropriate.

21        The government would reserve the rest of its argument.

22        THE COURT:  All right.  Let me hear from the

23   defense.  What is the defense's position?

24        MS. RIVERA:  I would love to respond, Your Honor.

25        I thought that the Court was soliciting the government's

1    position just as to the appropriate offense level and

2    calculation.

3            THE COURT:  No.  I'm asking for the argument as to

4    what the appropriate sentence should be.

5        I have already indicated that I would accept the

6    Probation Office's calculations, and that is technically

7    correct.

8            MS. RIVERA:  Understood, Your Honor.

9        I think we have fully briefed the use of the computer

10   and why that enhancement is not accurate in this case, or

11   excuse me, not appropriate in this case.

12       I do want to address acceptance of responsibility.

13           THE COURT:  Let me stop.  For the record, I reject

14   the argument that it's not accurate.  I mean, it can be used.

15   It was used by the Probation Office.

16       I have indicated I think the Probation Office's

17   calculation is correct, so the fact that they added two levels

18   for use of computer is consistent with the law.

19       I think that -- I would find that in this day and age

20   everything we do nowadays is touched upon a computer, either

21   cell phones or laptops or whatever, that it's no big deal in

22   terms of a crime being involved with some use of computer.

23       But the guidelines say what they say, I'm not

24   overturning it in any, way, shape or form, but technically the

25   probation is right whether it did add on the two points.

```
 1            MS. RIVERA:  Thank you, Your Honor.
 2            We maintain that objection, but I would like to address
 3    acceptance of responsibility, because I do think that as we
 4    have already briefed in the papers, I don't want to belabor it,
 5    but Mr. Stella is entitled to acceptance of responsibility in
 6    this case.
 7            I think some of the points that government counsel made,
 8    I have never heard of a defendant not being given acceptance of
 9    responsibility credit, because he hasn't paid restitution
10    before he even pled or before he was sentenced.
11            THE COURT:  That was somewhat of a novel argument.
12    I do agree, I have never heard it -- maybe it's true, but I
13    have never heard that argument before.
14            MS. RIVERA:  It's nothing I have seen in court, Your
15    Honor.
16            Additionally, a point was made that Mr. Stella didn't
17    surrender.  I'm sure the Court recalls from the evidentiary
18    hearings on the motion to suppress, he wasn't given that
19    opportunity.
20            In fact, when over 25 agents showed up at his house in
21    July 2021, that morning, he called law enforcement himself
22    because he thought they were under attack.
23            If he had been given the opportunity to surrender on
24    these charges, he would have.
25            THE COURT:  Let me stop you.  I agree with you on
```

1    that point.

2            MS. RIVERA:   Another point I would like to make is

3    Mr. Stella, while maybe he wasn't an active participant in the

4    investigation of his case because he was in custody, my

5    understanding is that he provided the government with passwords

6    to his devices.

7            Then, you know, there was a lot made about his -- what

8    has been going on since he's been in custody at MDC.

9            I think government counsel said he's not undergoing

10   therapy for pedophilia.

11           I think that reflects a real understanding about the

12   reality of being detained at MDC in pretrial, in general

13   population, when you have these types of charges.

14           The document that government referred to from June 2023,

15   from Bureau of Prisons report, what it actually shows -- I

16   don't think it supports their position, quite the opposite.

17           Mr. Stella did try to get help at one point in June

18   of 2023, and they came to him over a week later.

19           So it doesn't really show that he is being provided any

20   meaningful assistance at MDC, that MDC has the capability to do

21   that.

22           Then, with respect to whether these MDC records confirm

23   what is in the VA records, that the defense submitted to the

24   Court, that show Mr. Stella was diagnosed with PTSD and TBIs,

25   the whole point is we're talking about his PTSD and how those

1    symptoms manifested from 2017 through 2021.

2            THE COURT:  There is a question in my mind whether

3    or not there is any evidence to connect the PTSD with the

4    criminal conduct that is alleged here in the case.

5            In other words, I will accept -- I guess, there is

6    evidence of the PDSD -- no, actually, PTSD, but I don't

7    understand -- it is not being argued, it is just vacated, it is

8    not being connected to the criminal conduct here.

9            MS. RIVERA:  I don't want to get away from the point

10   I was making about acceptance of responsibility, because I do

11   want to address the PTSD with respect to the 3553(a) factors in

12   terms of the nature of the offense, and what led Mr. Stella to

13   engage in this really anomalous unusual conduct, given who he

14   has been all of his life and was after that period of time.

15           But suffice it to say, I will be addressing that going

16   forward, Your Honor.

17           But the other point I wanted to make about the

18   acceptance of responsibility is that I'm not sure how

19   Mr. Stella is unique in terms of defendants and strategically

20   pleading guilty to certain charges at any point.

21           He plead guilty to three points well before trial.  He's

22   entitled acceptance of responsibility for those, and moreover,

23   he agreed to waive jury trial to mitigate any further harm or

24   trauma to the minor victims.

25           We even briefed it.  Your Honor might recall that we

1    briefed an objection to the government going forward with this

2    case in front of a jury in an attempt to -- you know, we were

3    trying to mitigate any harm.

4            So I think that is another reason that Mr. Stella is

5    entitled to acceptance of responsibility on these counts.

6            THE COURT:  What else do you want to argue?

7            MS. RIVERA:  I'm happy to argue --

8            THE COURT:  Well, I want the parties to address the

9    -- the real issue.  The real issue is the amount of time I

10   should sentence him to.

11           There is a mandatory minimum of 15 years, and there is a

12   top, I guess, of if I want to use the Probation Office's

13   recommendation, for 150 years.

14           I have known multiple murderers who have gotten less

15   than 150 years.

16           MS. RIVERA:  That's right, Your Honor.

17           We maintain our position that is laid out in the

18   sentencing position paper.

19           I don't want to belabor a lot of it, but I think some of

20   this bears repeating a sentence of 15 years' imprisonment

21   followed by a lengthy term of supervised release that would be

22   accompanied by a really rigorous onerous condition, that that

23   sentence is more than sufficient to achieve the statutory goals

24   of sentencing.

25           Before I go into the reasons why we have maintained that

1    that is the appropriate sentence here, I want to address the

2    alternative sentence that the government has put before the

3    Court, because it's a life sentence.

4        I don't want there to be any mistake about that.  That

5    is what they are requesting that Your Honor sentence Mr. Stella

6    to, when they request a sentence of over six decades in prison.

7        To impose a life sentence like that, would mean that we

8    would have to agree or the Court would have to believe that

9    Mr. Stella is irredeemable and unfixable and beyond redemption

10   and rehabilitation, and that is demonstrably false.

11       That is not who he has been all of his life, it is not

12   who he has been since his offense conduct.

13       I think it's pretty clearly laid out in every single

14   letter that has been filed with the Court.

15       There is one more thing I want to say that it sort of

16   relates back to acceptance of responsibility, Your Honor, that

17   is because there will be an appeal in this case, we have

18   advised Mr. Stella not to allocute today, but, you know, I do

19   want to share he is remorseful, of course, he's devastated to

20   find himself in this position.

21       THE COURT:  Obviously, it's his choice whether or

22   not he wants to allocute or not.

23       But let me just ask, because the issue is that there is

24   going to be an appeal, they are going to take an appeal, you

25   know, it's obviously a choice, but I don't necessarily

1    understand the connection of his declining to allocute and --

2    well, let me take a step back, he has submitted a letter,

3    obviously, I have read the letter.

4              MS. RIVERA:  Mr. Stella himself has not submitted a

5    letter.

6              THE COURT:  I thought there was a letter submitted

7    from him?

8              MS. RIVERA:  Well, there has been several letters on

9    his behalf.

10             THE COURT:  I have seen the letter from wife, his

11   sons, his daughter, et cetera, I thought he had submitted one

12   himself?

13             MS. RIVERA:  Each of these letters show in their

14   hearts and in conversations that Mr. Stella is deeply

15   remorseful, he has accepted that, you know, he made some

16   serious errors.

17        He's reflected on his past, and is trying to figure out

18   the best way to move forward.

19             THE COURT:  All right.

20             MS. RIVERA:  The punishment is necessary in this

21   case, and I want to talk about the appropriate punishment that

22   will avoid unwarranted sentencing disparities, as required by

23   Section 3553(a)(6).

24        In the defense's position paper, we address I think

25   about 20 different cases from this District with either similar

1  or more egregious conduct.

2      You know, I apologize to the Court that those -- even

3  those brief descriptions in those cases are really graphic and

4  can be difficult to read, but in a way --

5      THE COURT:  The, to my mind, the possession of child

6  pornography is something that -- I have had so many of those

7  cases.  I understand what the range is.

8      The difference in this case is the fact that the

9  defendant generated images from his own house with persons that

10 have been referencing as being under his supervisory control.

11     I don't think any of cases that you cite really have

12 that element as the --

13     MS. RIVERA:  I disagree with that characterization,

14 Your Honor.

15     So beginning on page 18 of the defense's position paper,

16 you know, there is a sentence there that was before that Court

17 and that was a production case.  It involved the surreptitious

18 recording of a 14-year-old stepdaughter.

19     Mr. Leppe there was sentenced to ten years'

20 incarceration with a lengthy 20 year --

21     THE COURT:  But here, we have three, that was only

22 one.

23     MS. RIVERA:  Your Honor, we could move on to Coates,

24 which was a production case, which involved I think two minors

25 and the production of child pornography where that particular

1  defendant, unlike Mr. Stella, who has no criminal history, has

2  never been arrested, that particular defendant had a prior

3  conviction for sexual battery of a rape of a disabled adult

4  woman who suffered from a Down syndrome.

5       I think if we look at the case on page 19 of the

6  defense's position paper, Mr. Ramirez secretly installed a

7  hidden camera in a room of a 14-year-old girl that he then --

8  he also used peer-to-peer network to share and download

9  additional images and this habit of his persisted for over a

10  decade.

11       There are several cases like that that are cited in this

12  -- that are cited here that either have similar or more

13  egregious conduct.

14       I think those are necessary points of reference for this

15  Court in figuring out what an appropriate sentence is and how

16  we can avoid unwarranted sentencing disparities.

17       A lot of those cases involved the production of images

18  that depict actual touching.

19       The production charges here as the Court has already

20  said, relate to images that were captured from the family

21  bathroom.

22       For Victim 3, I think it's a couple of still images of

23  her as she was about to or just completed using the toilet.

24       Victim 1, Victim 2, they were getting in and out of the

25  shower.  There was no -- no one was directed -- no one was

1    posed, no one was touched, there was no one else depicted in

2    any of those images.

3            For the reasons, the offense conduct also stands apart

4    from the offense conduct that is described and related in these

5    other cases that we have cited in our position paper.

6            That is how sentences have been imposed in this

7    particular District.

8            But then we also looked at the national statistics, and

9    we pulled the statistics from JASON, the Judicial Sentencing

10   Information Network Platform, and those are at Defense

11   Exhibit U.

12           As the Court already noted, for a defendant under this

13   particular guideline with an offense level of 39, so that would

14   be incorporating a reduction for acceptance of responsibility

15   and Criminal History I, the average sentence, the national

16   average sentence, looking at over 100 cases, is 232 months.

17               THE COURT:  I already referenced that.

18               MS. RIVERA:  Sorry?

19               THE COURT:  I already referenced that.

20               MS. RIVERA:  Right.  I'm repeating that, Your Honor,

21   because I think it bears repeating.

22               THE COURT:  We don't know what gave rise to the

23   Level 39 in those situations.

24               MS. RIVERA:  Correct.  We know there is meaningful

25   mitigation in this case and that there are powerful reasons to

```
 1    vary downward.  This 232, the government's requested sentence
 2    of 65 years is 780 months.
 3              THE COURT:  Let's put it this way, the 65 years
 4    sentence is a life sentence.
 5              MS. RIVERA:  It's a life sentence and it's more than
 6    three times the national average for somebody of that same
 7    section of the guidelines.
 8         Mr. Stella is 51 years old, Your Honor.
 9         If the Court sentences him to the mandatory minimum
10    sentence of 15 years, he will be in his mid 60s by the time he
11    is released.  His wife will also be in her mid 60s.
12         His parents may have passed away by then.
13         His children will have grown and he will have missed
14    major milestones in their lives, such as college graduation,
15    marriages, all sorts of different things that happen in an
16    adult's life and he will be in custody that entire time.
17         So if the Court even imposes a mandatory minimum
18    sentence, the world will be a vastly different place by the
19    time Mr. Stella is released, and that on its own is sufficient
20    retribution and punishment.
21         Then, if the Court imposes that 15-year mandatory
22    minimum sentence and a lengthy term of supervised release,
23    20 years, Mr. Stella would be in his mid to late 80s by the
24    time he could come close to completing supervision.
25         So, it's essentially a lifetime of imprisonment and
```

1  supervision under onerous, rigorous conditions and that is

2  sufficient, general and specific deterrence, and it's also

3  sufficient to protect the public.

4       So, at bottom, Your Honor, our view is that a life

5  sentence in this particular case, given the nature and

6  circumstances of the offense, given Mr. Stella's unique

7  personal history and characteristics, a life sentence would be

8  completely unfair, unjust, and unjustified.

9       For all of the reasons we have laid out in our papers,

10  and I have stated or restated here, Your Honor, to comply with

11  3553(a), a 15-year sentence followed by a very lengthy period

12  of supervised release is what we're asking for here.

13       THE COURT:  Okay.  Let me hear a response from the

14  government.

15       MS. ALLSOP:  Thank you, Your Honor.

16       The guidelines set the bar here in this case for life.

17       The government has come down in its sentencing

18  recommendation to 65 years, which I misspoke earlier, would not

19  be considered a variance.

20       THE COURT:  So 65, for all intents and purposes, is

21  a life sentence.

22       MS. ALLSOP:  It is, Your Honor.  It's within

23  guideline sentence and for any factors that Your Honor may

24  consider as mitigating, although the government briefed this

25  in its papers, it sees very few mitigating facts in this case.

1    This 65-year recommendation does take that into account.

2         So 15 years in prison, as the defense proposes, is

3    insufficient considering the defendant's conduct and the pain

4    he has inflicted on multiple victims in this case.

5         With good time credit, he would serve likely around nine

6    years in prison at that point in time, that means he will be in

7    his 60s when he is released.

8         At that age he will most certainly be a threat to

9    children.  He can still download CP.  He would still be able to

10   place hidden cameras to capture children in their bathrooms and

11   in their bedrooms when they are naked.

12             THE COURT:  That one is a stretch.

13             MS. ALLSOP:  At 60 years old --

14             THE COURT:  Physically he could do that, but how is

15   he going to get access to it?

16             MS. ALLSOP:  He could be in another house with

17   children, his children could have children.

18         There is no guarantee he won't be around other children,

19   when he is released in his 60s.

20         In the defendant's own words, he knows enough about

21   computers and technology to be dangerous.

22         A 65-year prison sentence would guarantee he would never

23   be able to harm another child again, and this sentence is just

24   considering the nature of the offenses and relevant conduct in

25   this case.

1    This sentence is also required to avoid sentencing

2 disparities.

3    In its position papers, the defense points to several

4 cases which the government believes are in opposite, largely

5 because as Your Honor previously identified, the defense

6 conduct is dissimilar, and in some of those cases, the

7 defendants plead guilty.

8    The government would respectfully submit that a more on

9 point case would be the *Boam* case, which the defense cited in

10 its papers.

11    In *Boam*, the defendant was charged with both production

12 and possession of child pornography, similar to the defendant

13 in this case.

14    In *Boam*, the defendant surreptitiously recorded his

15 stepdaughter in various stages of undress.  He also exposed

16 himself to his stepdaughter and in this specific case, there

17 was a hands-on contact offense.

18    The defendant was found guilty at trial and sentenced to

19 45 years' imprisonment and a lifetime period of supervised

20 release.

21    Here, the government is asking for 65 years

22 imprisonment, which is more than in *Boam*, however, as Your

23 Honor identified earlier, there are more victims in this case.

24    So the government would submit that a 65-year sentence

25 is appropriate, accounting for the multiple victims in this

1    case, and also the manner in which the defendant abused his

2    position of power when he produced the child pornography at

3    issue.

4         The sentence of 15 years is, honestly, inconsistent with

5    the types of sentences given in other production cases around

6    the country.

7         From the Sentencing Commission's 2021 report, child

8    pornography offenders generally receive --

9         THE COURT:  In those production cases, were those

10   production cases only for personal consumption or were those

11   production cases that the images were sent through the Internet

12   or otherwise provided to other people?

13        MS. ALLSOP:  The Sentencing Commission report does

14   not particularly make that breakdown, but it generally says, as

15   of the fiscal year of 2019, that production offenders generally

16   received average sentence of around 23 years or 275 months.

17        In addition, Courts typically impose longer sentences,

18   when offenders, like the defendant, produced child pornography

19   of their children.  There, the sentences were on average around

20   28 and 1/3 years, around 340 months.

21        In addition, the sentences were often generally higher

22   when the production offenders were in the same location as the

23   victims, which occurred here, and in those instances, the

24   sentences were around 302 months.

25        As it relates to the defense's, sort of, earlier

position, and I will touch on this briefly because it seems

Your Honor does not see a causal link between the defendant's

purported PTSD and his production of child pornography, but the

government would highlight again that noticeably absent from

the defense's filings is a report from a licensed professional

establishing that causal link.

There isn't a report like this, because there isn't a

link between the two.

The defendant did not become a pedophile because of war

trauma.

When he enlisted in the military, he likely may have

already had developed his sexual interest in children, and

rather than accepting responsibility and acknowledging this, he

is attempting to wrap himself in the American flag and lean on

his military service to excuse his crimes.

In considering that he pledged to honor, protect, and

serve both his country and its citizens, his behavior is that

much more disgusting, because he preyed on this nation's most

vulnerable children.

THE COURT:  I don't think he's raising his military

service as an excuse.

I think he's raising his military service in an attempt

to have the Court recognize it and to lower the sentence.

MS. ALLSOP:  The military service is, Your Honor, in

our position, intertwined with the PTSD in that the PTSD which

```
1    is related to the military service, so the defense says --

2             THE COURT:  Again, I'm not finding a connection with

3    the PTSD and the crimes.

4         So I'm not using it to say that I would excuse his

5    conduct because of it, but I would consider his military

6    service and his award of the Bronze metal as a factor to lower

7    the sentence.

8             MS. ALLSOP:  Understood, Your Honor.

9         In this case, the government has interviewed several

10   people, many of whom pointed out that since they have known

11   him, the defendant has always had a peculiar interest in female

12   children's bodies.

13        One individual shared that at a social gathering that

14   the defendant emphatically commented on the breasts of a

15   teenage girl, she declaring loudly:  She has boobies.

16        A common thread amongst these stories, is that the

17   defendant's family would commonly dismiss his degenerate

18   behavior with a single phrase:  That is just Rob.

19        And his family's dismissiveness is reflected yet still

20   in their letters of support, where, for example, they say he

21   has returned to his true self in the summer of 2020.

22        However, if that was true, he would have destroyed or

23   deleted the child pornography that he kept in his hard drives

24   and on his computers until July 2021, when he was arrested.

25        The defendant had those child pornography materials
```

1    because he wanted to have them, because he's a pedophile who

2    enjoys viewing child pornography and producing it in his own

3    home.

4         It is impossible to reconcile the defendant's predatory

5    conduct with the loving and protective father, son and husband

6    who is described in his letters of support, and that is

7    because, Your Honor, you can't.

8         The defendant is two people.  The person he shows his

9    loved ones, and the person who's revealed by his conduct.  The

10   person who secretly recorded three girls while they were naked

11   in his home; the person who possessed hundreds of images of

12   child pornography that included girls as young as five being

13   penetrated by adult men; the person who created a log-in for

14   365 CP on the dark net using the last name of his platoon mate,

15   a known child sex offender, Gregory Sierdon and the Number 69,

16   which symbolizes two people mutually engaging in oral sex.

17        The person who committed additional conduct that is

18   relayed in Paragraph 90 of the pre-sentence investigation

19   report, that is the man that is being sentenced today, and that

20   man deserves a 65-year imprisonment sentence and a lifetime

21   period of supervised release.

22             THE COURT:  Is all right.  Anything else from

23   counsel?

24             MS. RIVERA:  Yes, Your Honor.

25        I would just like to be heard to respond to some of

1    this.  I think this goes to the 3553(a) factors.

2         The government has argued that Mr. Stella -- actually,

3    the thing I want to address first is a misstatement with

4    respect to when Mr. Stella would be released on any sentence.

5         And it seems that the government has erroneously

6    suggested or argued that Mr. Stella would be entitled to earn

7    time credit under the First Step Act, and that is simply not

8    true.

9         The convictions of offense here disqualify him from

10   earning time -- he would not be entitled to earn time credits.

11   He would not be getting out in nine years.

12        He would not be getting out when he is 60 when the

13   government claims he could be.

14        He could be putting cameras anywhere, that is not the

15   case, and as the Court responded, he would be subject to

16   serious terms of supervised release.  He would be under strict

17   scrutiny by a probation officer.

18        So, I don't really see that as reasonable or realistic

19   probability, no matter what the Court sentences Mr. Stella to,

20   but certainly, if the Court sentences Mr. Stella to 15 years,

21   he won't be out in nine.

22        Then I just wanted to address that the government has

23   argued essentially that Mr. Stella's lifetime of good conduct,

24   his lifetime of really being an exemplary person before this

25   offense conduct and afterwards, and that it isn't enough to

1    negate the offense conduct here, and we don't dispute that.

2         But by the same token, the actions he undertook during

3    those few years when everybody said he simply wasn't himself,

4    those don't cancel out his lifetime of good acts either.

5         And any view to the contrary, really reflects a

6    misguided and binary view of this case and these kinds of

7    cases, as if everything is only black and white or if somebody

8    is wholly good or wholly bad, but we know that is not the case.

9         We know people are complicated and good people do bad

10   things sometimes, and that's why they find themselves in front

11   of this Court, like Mr. Stella.

12        So, because it's been addressed by the government, I do

13   want to briefly address Mr. Stella's personal history and

14   characteristics, because he does stand apart from most or

15   almost all criminal defendants in so many significant ways.

16        The Court already noted Mr. Stella is a first-time

17   offender.  He's never even been arrested.  He was never

18   disciplined at any point during his 24 years of service in this

19   country.

20        And then, you know, since his arrest in this case, in

21   briefing, in this Court, a lot has been said about Mr. Stella

22   that kind of only makes sense, can only really be understood as

23   an issue of confirmation bias.

24        Now Mr. Stella has been arrested, now he's been

25   convicted, everybody is looking back at things that he did

1   previously, and they are suddenly seeing them through a

2   different lens.

3          Suddenly, just to address one, because I don't think

4   it's really worth anybody's time to get into this, but suddenly

5   when Mr. Stella is making pancakes for a family friend is

6   considered grooming.  I think that is one of those leaps of

7   logic that is, sort of, irrational and doesn't have any place

8   here.

9          What is really important, and that's what I want to

10  focus on, is who has been Mr. Stella been for all of his life?

11  What was going on with him at the time of the offense conduct

12  that led him to engage in this conduct?

13         What sentence will be sufficient, but not greater than

14  necessary to punish him, because that is what the Court is

15  tasked with imposing.

16         What will be sufficient, but not greater than necessary

17  to punish him, and that's why we provided the Court with all of

18  these additional cases for comparison.

19         So who is Mr. Stella?  The Court has a good sense of him

20  by now, because tons of people reached out to us to provide

21  letters to the Court.  There were family members, friends,

22  people from church, people who have known Mr. Stella for all of

23  his life, and people who have own known him for ten years.

24  They all describe him as somebody who truly dazzled them.

25         They uniformly described him as someone who is

1  incredibly smart, hilariously funny, and deeply kind.

2         Just to say, I know we filed a lot of letters in support

3  of our position paper, but we received even more, Your Honor.

4  That is because that is the kind of person Rob Stella is and

5  that's the kind of people who his friends are.

6         He is described in all of these letters as somebody who

7  is completely devoted to his parents, his wife, his children.

8         He's a loyal and steadfast friend.  Everyone knows him

9  as a devout Christian who shares the word of God with others,

10  including since his arrest in this case, at MDC, he has been

11  hosting a bible study where he pays out of his own money for

12  commissary that he can host a raffle for other inmates, and

13  that is the kind of person he is.

14         As the Court knows, he served honorably in the Navy for

15  24 years.  He received several awards and commendations during

16  that time.

17         He was sent out on several different combat deployments

18  when he was away from his family.  He saw and survived terrible

19  traumatizing events one after another, and because of those, he

20  has PTSD.

21         He also sustained traumatic brain injuries, so when he

22  finally returned to his family, when he finally retired in

23  2017, he came back home broken.  That is reflected in the

24  letters, Your Honor.  That is reflected in the letters.

25         I mean, probably the majority of the letters, they

1  explained that during those first few years when he was back

2  home, Mr. Stella was struggling.  He seemed isolated, agitated,

3  impulsive, and lost.

4          You know, the government points out that we haven't come

5  forward with some sort of report making a direct and causal

6  connection of the PTSD to this particular offense conduct, and

7  that is correct, Your Honor, but I think it's shown in the

8  letters that he simply was not himself, that he was struggling

9  during that time to control himself; that he had moments of

10  extreme aggravation, agitation, and distress.

11          His wife referred to this period of time as the cloud;

12  she still does.  His children describe it, I think one of them

13  described it as a very dark period when his father was simply

14  not himself.

15          So, you know, PTSD is complicated.  The brain is

16  complicated.  I'm sure that we can all -- we can all

17  acknowledge that there is a lot that we don't know about how

18  all of this works, how the traumatic brain injuries work,

19  whether Mr. Stella sustained CTE, which can't be proven, absent

20  an autopsy.

21          So we're in a difficult place where we don't have any

22  causal connection, and I acknowledge that, but what we do know

23  during the period of time from the offense conduct, he wasn't

24  himself; he wasn't always able to control himself.

25          Before his arrest, before this indictment, this is also

1   reflected in the letter, he was able to find a way out from all

2   of this.

3        He started doing his daily bible devotional, which he

4   has continued to do, even at MDC.  He developed a relationship

5   with a mentor from his church, who he respects.

6        That is -- I guess another point I want to make, Your

7   Honor, is the government filed with their position paper

8   Mr. Stella's initial interview when he was first arrested.

9        He described in there his PTSD, that for a period of

10  time he was having a lot of trouble controlling himself.  He

11  was having moments of rage.  He said I have started doing these

12  daily devotionals, this isn't something we just created for

13  sentencing purposes, this is reflected in his interrogation

14  from July 2021.

15       He also said, hey, I'm supposed to meet up with a friend

16  from church, can I give him a call?

17       That is all reflected in contemporaneous statements from

18  Mr. Stella; that he had been struggling, that he was doing his

19  best to right the ship.

20       He has continued that positive path forward while at

21  MDC, and I think that is really remarkable.  Anybody who knows

22  anything about MDC, knows it's an incredibly difficult place

23  for anybody.

24       It's a difficult place for anybody.  It's so much worse

25  for somebody facing these charges to be in general population,

1  and Mr. Stella has done that.  He has stayed in general

2  population, when he could have opted out and tried to go to the

3  SHU, I guess, because he wants to maintain a close relationship

4  with his family members.

5         If he's in the SHU, he's not able to call them; he's not

6  able to have social visits, but instead, it's been important to

7  him -- deeply important and meaningfully to his family to be

8  able to visit him and offer him their ongoing support and

9  receive his.

10        So, you know, as I readdress, we have advised Mr. Stella

11  not to allocute.  I have already said that I can share he's

12  deeply remorseful for his conduct; that he struggles still to

13  understand how it happened; that he is reliving a lot of the

14  trauma from some of his combat deployments, and some of these

15  things, at least to me, I'm not an expert, do seem connected.

16        But essentially, when we talk about Robert Stella, we're

17  talking about somebody who spent almost his entire life doing

18  the right thing, doing the exemplary thing.

19        There was this period of time that no one understands

20  where things went sideways for him.  We know he has to be

21  punished for that.

22        We recognize the need for just punishment deterrence and

23  future misconduct and protecting the public.

24        But 15 years in prison, followed by a lengthy term of

25  supervised release under strict conditions, is more than

1  sufficient to meet those goals of sentencing.

2          THE COURT:  All right.  Does the government want to

3  say anything else?

4          MS. ALLSOP:  No, Your Honor.  At this time, I

5  believe there are victims and their parents who would like to

6  address the Court.

7          THE COURT:  How many are there going to be?

8          MS. ALLSOP:  Two from the government, Your Honor,

9  and I believe one from the defense.

10          THE COURT:  All right.  Let me hear -- let me ask

11  any special requirements insofar as my listening to them in

12  court?

13          MS. ALLSOP:  No, Your Honor.

14          THE COURT:  All right.  Why don't you present them.

15          THE VICTIM:  My name is Madeline Kelly, and I am one

16  of the victims in the Robert Stella case.

17      I am 18 years old, and I'm sorry, I'm in my freshman

18  year of college.  I'm supposed to be experiencing some of the

19  best times in my life right now, but the last few years have

20  felt like something out of a horror movie for me.

21      My world, as I knew it, has been turned upside down.  I

22  have known this man since the age of three.  He was like a

23  second father to me, and I trusted him.  I would have trusted

24  him with my entire life, called him for anything that I needed

25  and that trust has been absolutely broken.

1          I now suffer from horrendous panic attacks and extreme

2    anxiety.  I have always been described as happy, go lucky,

3    positive upbeat person, but this has turned me into someone I

4    don't know.

5          I have been going to therapy for the last few years to

6    find ways to help cope with the trauma and ways that you might

7    not understand.

8          I am unable to try on clothes in a store in front of

9    mirrors.  I can't use public restrooms.  I have apps on my

10   phone that I now use to go over mirrors and bathrooms when we

11   stay in hotels.

12         And I get triggered by things that happen at school and

13   at my jobs.  I have had to leave both on many occasions because

14   I have had panic attacks associated with my trauma and

15   countless other ways that I never would have thought of.

16         Living in a dorm at college has brought its own

17   challenges, because I'm no longer in the safety and comfort of

18   my own home, where I was finally starting to feel better.

19         I am working through this with my counselor, so I can

20   still pursue and achieve my life goals.  I want to be a

21   veterinarian after college.  This has been my dream since I was

22   very little and I have always been a straight A student.  This

23   has severely affected my ability to think and concentrate.

24         I'm fearful that it will affect my future that I have

25   worked so hard for.  This has affected every aspect of my life

1    even in ways I never thought it would.

2         My relationships with people have changed, and I have

3    severe trust issues, and I can continue to work through them,

4    but still have not been able to trust a single person since.

5         I feel like I have lost and losing my very best friend

6    in the family that I once considered my own.

7         I never thought that someone so important to me could

8    betray me in the way he did.

9         He was once a person that I would have gone to for 15

10   years and treating them all like family, and I never thought I

11   would be proven so wrong.

12        I wake up crying in nightmares on a daily basis, and I

13   have horrible thoughts associated with the anxiety that this

14   trauma has created.

15        I want to move on and heal, and I want to do well in

16   college and pursue my dreams that I have for a normal feature,

17   and I need closure for this to happen.

18        I just don't want this to effect my future more than it

19   has already -- already has.

20        And the hardest part is that my love for the entire

21   family is not something that I can make disappear, and the hurt

22   that I feel is more than anyone else would have hurt me, and I

23   just wish -- I wish it never would have happened, but, yeah.

24   That's all I have to say.  Thank you.

25             THE COURT:  Thank you very much.

1          The next person?

2          THE VICTIM:  My name is Ataulia Elias.  I'm the

3    third victim to Robert Stella.

4          Rob was never just -- Rob was never just another parent

5    of a friend, he was never just the dad of my best friend.  In a

6    way he was also mine, picking me up from school every

7    Wednesday, taking us to Universal, taking us to go see puppies,

8    and seeing their family is one extension of my home until July

9    of 2020.

10         This was the month of the year I finally found out what

11   Rob had done to me.

12         I remember not being able to comprehend how someone

13   could have done this.

14            I remember Johnny and --

15         THE COURT:  Sorry, let me stop you.  The reporter has to

16   take what you are saying, so just go a little slower.  You are

17   going too fast for her.

18            THE WITNESS:  This was the month of the year I found

19   out what Rob had done to me.

20         I remember not being able to comprehend how someone

21   could have done this.

22         I remember drowning in this overwhelming feeling,

23   overwhelming with the feeling of betrayal and invasion of

24   privacy.

25            Because of these feelings, I learned to shut out

1    everything and everyone.

2          I was feeling so much, I couldn't handle all of it.  I

3    couldn't process it or even begin to fathom it, so I pushed it

4    away and pretended for so long it wasn't happening, until my

5    life continued, I found myself affected by what he had done.

6          In every bathroom I went into and every dressing room,

7    even in my home, I felt like I was being watched.  Like, there

8    was a camera somewhere hidden spying on me and exploiting me.

9    I began not to trust anyone.  I always feel as if people have

10   hidden motives.

11         As I continue on with my life, I see how it will affect

12   me in the future.

13         Will I ever be comfortable enough to sleep over at a

14   friend's house without secretly looking where cameras could be

15   hidden?

16         When I become a mom, would I ever be comfortable sending

17   my kid with another parent?  Would I ever be able to fully

18   trust anyone ever again, to fall in love with a man without

19   thinking he is a secret monster?

20         Not only has this affected my perspective on life, but

21   also my perception of myself.

22         The realization that my body was no longer something

23   sacred and instead something taken advantage of for whoever to

24   see.

25         Before I could allow it, my body was exploited to

1    whoever, wherever and whenever, and for this, I believe Rob

2    should be in jail to the day he dies.

3            For the amount of lives he has ruined, it is only right

4    for him to live in his own personal hell, as he has caused us

5    to live in ours without ever asking for it.

6            For goodness should be a human trait we carry, but for

7    Rob, he is no human, he is a monster.  A monster who feels no

8    remorse, and in return, should have none felt for him.  Thank

9    you.

10           THE COURT:  Thank you.

11           All right.  For the defense, do you have a person who

12   wants to allocute?

13           MR. RIVERA:  I don't know that I would characterize

14   this as a victim for the defense or anyone for the defense, but

15   my understanding is that there is the third victim, who wishes

16   to be heard.

17           THE COURT:  All right.  She's made a request to do

18   this not in open court?

19           MS. RIVERA:  I think that's right.  I think that is

20   right, I think the request was that it be sealed up.

21           THE COURT:  I will now excuse everyone from the

22   courtroom, except her immediate family.

23                   (Courtroom is sealed.)

24           THE COURT:  For the record, I have sealed the

25   courtroom except for the speaker, and her immediate family.

```
 1   Yes?
 2              THE WITNESS:  May I remove this?
 3              THE COURT:  Yes.
 4              THE VICTIM:  Good morning, Your Honor.  I'm Matty,
 5   Robert Stella's daughter.
 6         Please bear with me, because this is my first time I
 7   have been able to -- sorry -- speak.
 8              THE COURTROOM DEPUTY:  I'm sorry, this is defense
 9   counsel with the public defenders, are they okay to stay?
10              THE COURT:  No.  Unless, she's counsel.
11              MS. RIVERA:  She's counsel.
12              THE COURT:  If he is counsel, that is fine, but if
13   he is not counsel, no, but her, she can stay.
14              THE VOICE:  I am the supervisor of Ms. Rivera, I'm
15   not counsel either way.
16              THE COURT:  Then you are out.
17              THE WITNESS:  I don't care.
18              THE COURT:  Well, I have already sent him away to
19   make it easier for you.
20              THE WITNESS:  Sorry, I'm a little bit nervous.  This
21   is my first time I have been able to speak.
22         I'm here today because there are many people portraying
23   my dad as a monster and as a bad person.
24         Sorry, but I would like a chance to tell you why I know
25   that that is not true, and what I know of my dad.
```

1          I pray you will please listen to what I have to say,

2     because I have not been listened to by anyone in the court

3     system.

4          I know the other girls have been asked for like impact

5     statements, but nobody ever reached out to me, though, not

6     once, and that includes telling me hearing dates or my own

7     rights.  Nobody has reached out to me in regards to that.

8          And I know I have a right to be heard as well, but to

9     me, it feels like nobody wants to hear what I have to say,

10    because it doesn't fit their narrative or help them convict my

11    father because I'm standing by my dad.

12         I understand that that is really hard for a lot of

13    people in this room to understand, because all you guys are

14    seeing are the bad things in the short period -- short chapter

15    of his life.

16         But while you guys can write this down on a piece of

17    paper, I can fill a library with the good things that my dad

18    has done and the good person he is.

19         The truth is, Your Honor, even though everything -- even

20    with everything that happened during that time -- he is still

21    an incredible dad and an incredible person.

22         I would like to get into what it was like growing up

23    with my father.

24         Because he was a Navy seal, he was gone a lot, but even

25    though he was often gone, I still feel like I had a present

1    father.

2         When he was away, he called us and Skyped us every day,

3    and when he was home, he always made sure to get involved in

4    the things we were passionate about, whether that was taking me

5    to dance or learning a silly cheer routine with me, or taking

6    my brother to Taiwondo or working back stage when my brother

7    was in a play, he was there supporting us.

8         Excuse me if I'm wrong, but the prosecution is trying to

9    make this sound like grooming, and I would like to argue that

10   that is the complete opposite.

11        I believe my father was just doing normal fatherly

12   behaviors in supporting his child.

13        He did all of these things because he valued the time he

14   had with his family and cared about what we were doing and what

15   brought us joy.

16        He didn't want us to grow up feeling like we didn't have

17   a present father, though, he was gone so often.

18        But not only was he present, he was extraordinary.  I

19   believe I am the person today -- the person I am today because

20   of it.

21        My dad has taught me so many valuable lessons in life.

22   I would not be the strong, resilient, and independent woman I

23   am today if it was not for him.  He taught me to how to stand

24   up for myself and the ones I love.

25        He taught me to how to value myself, and he taught me

1    how to persevere through difficult situations and embrace them.

2          But one of the most important things he taught me was to

3    not bottle up my emotions and not keep things in.

4          He used an analogy with me, and he taught me -- he would

5    explain it in a sense of like your experiences can be held

6    within a plastic bottle, and you can only hold so much inside

7    without sharing, but eventually your bottle can't hold it all

8    in, and it leads to things getting out of hand.

9          In hindsight, I believe my father struggled within

10   himself and that's what led to him breaking, and I think that's

11   why he taught me this lesson.

12         I think he was trying his best to make sure I never had

13   to suffer alone, as he did.

14         You see, Your Honor, my dad went through a lot of

15   dangerous things in military and experience the horrors of war,

16   things that nobody in this courtroom could possibly imagine.

17         I think he kept these details from me and my family in

18   order to protect us, and by keeping that in that got the best

19   of him, his bottle exploded.

20         During this time in which these offenses occurred, my

21   dad was not himself.  He was never violent and he would never

22   hurt us, but he was clearly not okay.

23         I strongly believe my father was dealing with something

24   no one could ever imagine and not seeking help is the reason he

25   has behaved in such a way.

1          However, the summer of 2020, a year before my father was

2     arrested, I saw a huge difference in him.  It was like I got my

3     dad back.

4          He made many changes in his lifestyle, too many to list

5     here today, that I believe brought him out of the darkness he

6     was suffering in.

7          It seemed as though he had taken back control of his

8     life and he was in a better place.

9          And then Homeland Security showed up, and my dad was

10    gone again, just like that.  Sorry.

11         On July 15th, 2021, our lives changed forever.  This is

12    the day that law enforcement came to arrest my dad, and this is

13    the day we like to call the raid, because the way that law

14    enforcement showed up was something that I can't even explain

15    what it felt like to be woken up at 6:30 in the morning, to the

16    sounds of what I thought were gunshots at the door, explosions

17    in my backyard, and my family in distress.

18         I don't even know how to describe what was going through

19    my head.  I thought we were under attack.

20         We tried to call 911, and our phones were blocked.  We

21    didn't know what was going on.

22         But through all of this, my dad stayed calm and made

23    sure we were protected.

24         And once we had gone outside, the law enforcement had

25    guns, like, directly pointed at us, and that is not something

1    that I believe I should have had to go through or my family.

2         My dad was treated as though he's a dangerous criminal,

3    like, as if he had murdered somebody, and that is not the case

4    here.

5         So I just -- it never made sense to me why they showed

6    up with such extreme force for such a different case, and I

7    don't think it was right to traumatize our family.

8         I have had severe -- actually, I remember specifically

9    the same day he got arrested.  I was in a public restroom, and

10   I flushed the toilet and it made me physically jump, because I

11   had -- I would say trauma responses for a while from the

12   explosions and the gunshots that they had the day that they

13   took my father and it has affected me a lot since then.

14        Even at school, if somebody pops a chip bag, like, it

15   makes me jump, and I don't think it was right the way they did

16   that.

17        But anyways, in closing, if I may, Your Honor, I would

18   like to express that while we were -- we are heart broken

19   without him, I still find hope in this mess.

20        I'm constantly amazed and encouraged by the improvements

21   my father continues to make, even in his current situation.

22        I know that if given the chance, he will turn this into

23   something good.

24        I know my father is deeply sorry for his actions and any

25   harm they may have caused, but I am confident, if given the

1    chance, he will not repeat his mistakes.

2         I also believe he has the ability to do good in the

3    world and he has expressed a deep desire to work with other

4    veterans with PTSD.  I pray he gets that chance.

5         Your Honor, I ask that you may have a gracious heart and

6    let my father be returned to me as soon as possible.

7         I want my father to be there when I graduate from

8    college.  I want him to be there when I get married and I just

9    want him back.  Thank you.

10              THE COURT:  Thank you.

11              THE COURTROOM DEPUTY:  Before we start, Terri needs

12   to go to Riverside.  If that is okay, if we can switch

13   reporters now?

14              THE COURT:  Will we take about three minutes to

15   switch.

16              (The proceedings concluded at 11:19 a.m.)

17                         *  *  *

18

19

20

21

22

23

24

25

1          **CERTIFICATE OF OFFICIAL REPORTER**

2

3    COUNTY OF LOS ANGELES    )
                                       )
4    STATE OF CALIFORNIA     )

5

6          I, TERRI A. HOURIGAN, Federal Official Realtime

7    Court Reporter, in and for the United States District Court for

8    the Central District of California, do hereby certify that

9    pursuant to Section 753, Title 28, United States Code that the

10   foregoing is a true and correct transcript of the

11   stenographically reported proceedings held in the

12   above-entitled matter and that the transcript page format is in

13   conformance with the regulations of the judicial conference of

14   the United States.

15

16   Date: 25th day of March, 2024.

17

18

19                    /s/ TERRI A. HOURIGAN

20          _____
               TERRI A. HOURIGAN, CSR NO. 3838, RPR, CRR
21                    Federal Court Reporter

22

23

24

25